### UNITED STATES v. DRUMM (two cases).

### Nos. 221, 223.

District Court, D. Nevada.

May 1, 1944.

See also 50 F.Supp. 451.

Thomas O. Craven, U. S. Atty., of Reno, Nev., for libelant and plaintiff.

Oliver C. Custer, of Reno, Nev., for libelee and defendant.

NORCROSS, District Judge.

By stipulations of attorneys for the respective parties, the above cases were consolidated for trial and tried before the Court without a jury. Case No. 221 is an action to recover penalties for alleged violation of the Civil Aeronautics Act and Regulations made in pursuance thereof. Case No. 223 is an action to enjoin defendant from operating aircraft in violation of said Act and Regulations.

In case No. 221 libelee is charged with eleven causes of libel for violation of the Civil Aeronautics Act of 1938 as amended,

49 U.S.C.A. § 401 et seq., and Regulations adopted by the Civil Aeronautics Board. Applicable to all such charges is the preliminary allegation: "That on or about February 11, 1942, Libelee, Andrew D. Drumm, Jr. piloted said * * * Airplane on a flight from Fallon, Nevada, to Bishop, California. That on said flight Libelee was not possessed of a valid pilot certificate of competency, contrary to the provisions of section * * * 560(a) and section 60.30 of the Air Regulations; * * * *. * * * did not have in his possession an identification card * * * containing his finger prints, his picture and his signature, contrary to the provisions of section * * * 560(a) and section 60.322 of the * * * Regulations. * * *. That * * * the airworthiness certificate issued for said airplane was not carried in said airplane contrary to the provisions of section * * * 560 (a) and section 01.20 of the Civil Air Regulations * * *. * * * That * * * the appropriate Aircraft Operation Record * * * was not attached to the airworthiness certificate * * * and was not carried in said airplane, contrary to the provisions of section * * * 560(a) and sections 01.12 and 01.20 of the * * * Regulations; * * *. * * * That at the commencement of said flight said Libelee took off said airplane from a landing area * * * without having first received a clearance from a police officer or other public representative designated at such landing area for that purpose, contrary to the provisions of section * * * 560(a) and section 60.3305 of the * * * Regulations; * * *. * * * That Libelee * * * is a citizen and resident of Fallon, * * * Nevada; that during all times hereinafter mentioned * * * was the owner of and person in command of said * * * Airplane * * *. That on or about February 15, 1942, Libelee * * * piloted said * * * airplane * * * on a flight from an airport at or near Bishop, California to Independence, California; that said airport was then and there a designated landing area as defined in section 60.950(b) of the * * * Regulations. That said Libelee took off said airplane from said designated landing area without having first submitted to the Administrator of Civil Aeronautics or person designated by him at such landing area sufficient * * * or any information to describe the route, duration, nature and purpose of the proposed flight, con-

trary to the provisions of section * * * 560(a) and section 60.951 of the * * * Regulations; * * *. * * * without * * * securing a clearance * * * from the Administrator * * *, contrary to the provisions of section * * * 560(a) and section 60.951(c) of the * * * Regulations * * *. * * * was not possessed of a valid pilot certificate of competency * * *. * * * did not have in his possession an identification card * * *. That on said flight the airworthiness certificate * * * was not carried in said airplane * * *. That on said flight the appropriate Aircraft Operation Record * * * was not attached to the airworthiness certificate * * *." For each of the above alleged violations, judgment is sought against Libelee for the maximum penalty of one thousand dollars ($1000) and that the same be enforced against said airplane and its appurtenances.

In case No. 223 defendant is charged with the same violations as in Case 221. In addition thereto, that: "On or about February 19, 1942, at Independence, California, an authorized representative * * * sealed a suspension notice on said * * * airplane because of the violations and offenses hereinabove * * * alleged. Subsequently, defendant tore said suspension notice from said airplane, and in violation of law and the terms and provisions of said notice, defendant took off said airplane from Independence, California, on a flight to an undesignated destination. * * * Defendant has repeatedly * * * declared that he habitually operates aircraft in flight without a pilot's license; that the Civil Aeronautics Administration has no jurisdiction or authority over him; * * *."

Upon the trial, evidence, oral and documentary, was submitted upon the part of plaintiff and libelant and was admitted, subject to the objections of counsel for defendant and libelee to be considered upon the conclusion of the trial. Counsel for defendant and libelee rested the case upon the conclusion of the evidence offered by plaintiff and libelant subject to the legal objections interposed thereto.

The following is a gist of the testimony submitted: Dalton D. Ervin testified that he was then an Aeronautical Inspector of the Civil Aeronautics Administration, Department of Commerce; that on February 11, 1942, he was an Assistant Inspector, stationed at Bishop, California; the air-

port is about one and one-half miles east of the City; on that date I saw Mr. Drumm at the Bishop airport, come in, turn around, and taxi back to the south end of the field; I then took Mr. Engel in my auto and drove to within a few feet of the plane; Mr. Drumm was walking over to me and the pick-up that had come from the construction job going on at the airfield and I met him at the truck; I asked him if he had a clearance and he said he did not, that he came from his own private field in Fallon in his own private plane and he did not need any. I asked to see his pilot's license and he again stated that he did not have any, that he did not need any; that we had no jurisdiction over him whatsoever; he told the fellow in the pick-up to drive on and he left to the opposite side of the field, where the machinery and men were working. I saw Mr. Drumm later in the day at the police station. There were present Maurice Gaylord, Manager of the Bishop Airport, Mr. Horton, Chief of Police, and a deputy from Inyo County District Attorney's Office. At that time, Mr. Drumm stated to the Chief of Police that the Civil Air Regulations did not apply to him; that he had his own airport, his own airplane, did not fly on civil airways or over restricted areas, so, therefore, we had no jurisdiction over him. I know Bishop Airport was a designated landing area. I designated it myself. Eugene Scroggy, Chief of the General Instruction Branch of the Sixth Region at Santa Monica, so instructed; by having a manager and clearance officer, if I recall it was February 7, 1942, am not positive of exact date. It was prior to February 13, 1942. The designation of the airport is issued out of Washington on official designation.

Mr. Patrick Engel testified: On February 11, 1942, I lived at Bishop, California, was employed by the Fresno Air Service and was acting as armed guard at the Bishop Airport, located about three miles east of Bishop. On that date I saw the airplane referred to in this case; at that time, all our planes were grounded because of the wind velocity, all students were grounded, at that time; he landed, rolled towards the hanger about fifty yards therefrom, turned and taxied back toward the equipment that was being used on the airport, at that time, by the contractor. I heard parts of a conversation between Mr. Ervin and Mr. Drumm. He said he didn't have a pilot's license, had been flying for a good many years without one and didn't think he ever would have to have one. On February 15, 1942, I saw a car drive to the hanger, Mr. Drumm got out, went over to the airplane, which was tied down to the line, at that time, and took off towards the south. Independence is about forty miles distant southeast, airline.

Maurice B. Gaylord testified: That his rating was Second Lieutenant Army Air Corps then stationed at Merced, California, Merced Army Airfield; that on February 11, 1942, he was Airport Manager at Bishop Airport and was such manager on February 15, 1942. Saw Mr. Drumm on February 11, with Mr. Engel. I asked him if he had a clearance and he said he did not, he told me he didn't need any, he said he had no license. I told him he couldn't take off from the Bishop Airport without a clearance. He told me he had been flying for a number of years, 20 or 25 years, and he did not use any of the C.A.A. facilities. After the conversation he locked his airplane up and went over to Mr. Isbell, a contractor there, borrowed one of his pick-ups and drove into the town of Bishop. We went in with a car and got the Chief of Police of Bishop and took him to the police station, had a conversation there. He said the C.A.A. couldn't stop him from flying any place he wanted to as long as he wasn't using any C.A.A. facilities, stayed out of C.A.A. airports. We called the District Attorney at Independence, and he in turn called Santa Monica, where the C.A.A. office was and he phoned us back and had us release him, to go ahead and release him. We went back to the airport, the wind had increased so much, nobody could fly, so pushed the airplane near the hanger and tied it down and he locked his airplane and left them. I saw Mr. Drumm the morning he left, February 14, 1942, he came out and entered the airplane and took off. He did not obtain a clearance from any officer of the airport for his take-off, at that time.

Robert E. Dake testified that he was then a Major in the Army Air Corps at Fort Bragg, North Carolina; that in February, 1942, he was Senior Aeronautical Inspector for the Civil Aeronautics Authority, Sixth Region, California, embracing Bishop and Independence. On February 15, 1942, the airplane, referred to, was tied down on the southern edge of Independence Airport. With reference to the town

of Independence, the Airport is on the direct north edge, on the east side of the main highway. Searched the airplane and found no records or papers therein or thereon, then placed a red non-operating tag, I believe form 309, on the propellor of the aircraft, sealing it with the official Department of Commerce seal. The tag stated, in effect, that the aircraft should not be operated until an Inspector of the Civil Aeronautics Authority should be contacted. Thereafter I did not see the airplane and did not know what became of it.

John S. Fouche, Jr., last witness, testified: My rank is Major. On February 16, I was stationed in the Burbank office of Civil Aeronautics. My position was Aeronautical Inspector. I know Andrew D. Drumm, Jr. I met Mr. Drumm on February 16, 1942, at Las Vegas, Nevada, and had a conversation with him, he stated that he did not have a valid airman's certificate, that he flew anyway and would continue to do so, that he did not intend to take out a certificate, wasn't interested in having a certificate because that would then give the Civil Aeronautics Administration a hold on him. I offered to go out to the airport and give him any necessary amount of dual instruction to qualify him for a private pilot's license and I thought for a while he was interested and for some reason he changed his mind and that never happened.

A stipulation, subject to certain legal objections, and a reservation that the same would not constitute any admission of defendant, were admitted, reading: "that in the event John T. Morgan of Washington, D. C., should be called as witness on behalf of the United States * * * he would testify * * * as follows: That he is the Chief of the Certificate Section of the Civil Aeronautics Administration, Department of Commerce, * * * at Washington, D. C.; that in said capacity he has the legal custody of the official records * * *; that he has, subsequent to February 15, 1942, made a diligent and thorough search through the said official records and that such search failed to disclose any record whatsoever of the issuance of any grade of pilot certificate or of any airman certificate at any time to Andrew D. Drumm, Jr., or of the issuance of any identification card * * *."

It was stipulated that upon the flight on February 11, from Fallon to Bishop, and on February 15, from Bishop to Independence, defendant and libelee did not fly his plane upon, across or between the boundaries of any civil airway established by the Civil Aeronautics Administrator.

A certified copy of the original Part 60 of the Civil Air Regulations of the Civil Aeronautics Board with copies of amendments thereto in effect on February 11, 1942, on file in the Civil Aeronautics Board, were offered and admitted in evidence.

Copy of a telegram dated Washington, D. C., February 5, 1942, addressed to Regional Manager, Civil Aeronautics Admin. Santa Monica, California, signed, C. I. Stanton, was offered and admitted in evidence, reading:

"Airports inspected and found to meet all requirements and which are recommended for designation may be issued temporary designations for a period of not to exceed thirty (30) days from February 15, 1942, or date of inspection over signature of an inspector 'by direction of acting administrator' pending review of application by this office. This will permit operation under emergency regulations 60.95 during this period."

No evidence was offered respecting a "date of inspection over signature of an inspector 'by direction of acting administrator.' "

Civil Air Regulations of the Civil Aeronautics Board, covering "Part 60.—Air Traffic Rules, as amended to October 4, 1940," concluding with an additional amendment effective February 10, 1942, and "Regulations Serial Number 193 Title: Pilot and Aircraft Certificates Required Amendment No. 135 * * * Effective: December 1, 1941," were offered and admitted in evidence. The above "Regulations Serial Number 193" consist of amendments to prior Regulations designated: "60.30 and 60.31." So far as they may be applicable to this case, the Regulations, as amended, read:

"60.30 Pilot Certificates. No person shall pilot a civil aircraft in the United States unless such person holds a valid pilot certificate or in violation of any term, condition, or limitation of such certificate: * * *."

"60.31 Aircraft Certificate. No flight of civil aircraft, * * * shall be made or authorized to be made in the United States unless there is outstanding for such

aircraft a valid aircraft air-worthiness certificate, or in violation of any term, condition, or limitation of such certificate."

The amended sections, as above quoted, are preceded by certain Findings of Fact, numbered 1 to 14, and other "Further" Findings numbered 1 to 3 made by the Civil Aeronautics Board, following "a public hearing, after due notice, at its office in Washington, D. C., on the 24th day of September, 1941." The findings recite the increase in the number of certified pilots and miles by them flown from July 1, 1938, to September 1, 1941, "more than 200 per cent" and "100 per cent," respectively, "commercial charter operations" showed an increase of 80 per cent; "domestic scheduled air carrier operations representing an increase of more than 50 per cent." "During the year 1941, the aeronautical activity of the armed forces of the United States has increased tremendously and will increase in accordance with projected national defense plans." "The operations of uncertificated airmen anywhere in the navigable air space overlying the United States constitute a hazard to interstate, overseas and foreign air commerce." "In order to protect interstate, overseas and foreign air commerce, it is necessary that all pilots and aircraft operating in the air space overlying the United States be certified."

No evidence was introduced upon the part of defendant and libelee and the cases were finally submitted, and arguments and briefs filed, subject to objections interposed to certain evidence admitted. No cases were cited and none appear to have been rendered dealing directly with the law controlling a state of facts similar to those herein involved. The nearest approach to such a citation is the case of Rosenhan v. United States, 10 Cir., 131 F. 2d 932, 934, from which opinion is quoted the following excerpts:

"The Civil Aeronautics Act, supra, was enacted as advanced legislation in recognition of rapidly growing air commerce and was comprehensively designed to promote civil aeronautics, and to that end develop and secure maximum aeronautical safety. * * * The Act created a civil aeronautics authority to be composed of expert personnel, with powers to effectuate the full purposes of the Act. * * * Congress has not seen fit to limit the question of safety in these circumstances to a manifestation of actual danger, rather it

has sought to eliminate all potential elements of danger."

The evidence is insufficient to establish that Bishop was not a landing area effective prior to February 15, 1942. While construction work was then continuing, the airport was apparently then being used as a naval air training station.

The record discloses that the Civil Aeronautics Board on January 8, 1942, adopted "Civil Air Regulations Amendment 60-51 Effective Feb. 15, 1942," in part, reading:

" '60.95 Emergency regulations.

" '60.950 Definitions. (a) As used in this section (60.95), the term "aircraft" means all aircraft other than those operated by scheduled air carriers while on their certificated routes, the United States Army or Navy, the Civil Aeronautics administration, or the Civil Aeronautics Board.' "

With respect to the contention of counsel for defendant and libelee that the action of the Civil Aeronautics Board in amending sections 60.30 and 60.31 of the Civil Air Regulations, in effect, prohibiting any person to pilot a civil aircraft unless such person "Holds a valid pilot certificate" and the aircraft possesses an "airworthiness certificate," exceeded the authority of said Board, it is the conclusion of the Court that the same is without merit. It cannot be said from any evidence submitted or of which the Court may take judicial knowledge, that the findings of the Board were not well founded to the effect that there had been such increase in "aeronautical activity of the armed forces of the United States," the number of "certificated" and "uncertificated" pilots, that "any operation of any aircraft in the air space * * * either directly affects, or may endanger safety in, interstate, overseas, or foreign air commerce; * * * it is necessary that all pilots and aircraft * * * be certified * * * for the protection of safety in air commerce. * * *." Upon such findings, the amendments were within the powers conferred by the Act of Congress creating the Board.

As the said Amendments of the Regulations, by order of the Board, became effective December 1, 1941, they apply to all the flights, referred to in the pleadings, taken by the defendant and libelee on or subsequent to that date. The only questions remaining, relate to imposition of penalties and granting of injunction.

156

All of the violations grow out of the primary fact that libelee and defendant did not hold a valid pilot certificate or his aircraft possess an airworthiness certificate in accordance with the Civil Air Regulations. While counsel for libelant and plaintiff, in their brief stress the view, that because of expressions made by libelee and defendant to Aeronautic Officials at the time demands were made to see his pilot's certificate, identification card, and the airworthiness certificate, which certificate should have been on the plane by him piloted, the maximum penalty of One Thousand ($1000) Dollars should be imposed on each of the eleven offenses charged in case 221 and judgment for permanent injunction granted in case 223. While it must be conceded that the expressions were without any proper foundation, it does not appear that they were of the character that would occasion any injury to the personal or official standing of the persons to whom they were made while carrying on their official duties. Such expressions may be considered, also, from another point of view, in that they were made together with expressions to the effect that his flights did not affect interstate commerce and that as a citizen of the United States, not so engaged, he did not have to possess a pilot's license or was in any respect subject to the Act creating or the Regulations adopted by the Board. It is not uncommon that a similar character of expressions are made by citizens of good standing who, at the time, are impressed that their constitutional rights were invaded. It is not clear that such erroneous view was not the occasion for the expressions referred to in these cases. The Court is impressed that they were. While the designated maximum penalty applies to all violations of Regulations, it is clear that some Regulations deal with major and other with minor requirements upon the part of pilots of aircraft.

It is clear from the evidence that the flights in question were not commercial in character and that no commercial airroutes were entered. It is the conclusion of the Court that for all the violation of Regulations set forth in case No. 221, eleven in number, that judgment be, and the same hereby is, granted in favor of libelant for penalties in the total sum of Two Thousand Five Hundred ($2500) Dollars, and that said Luscombe Airplane No. NC 37066 be subject to a lien for said penalties, and for costs of suit.

That in case No. 223, plaintiff be granted a permanent injunction as prayed for, subject to the condition that upon defendant securing a pilot's certificate, as prescribed by said Regulation, such injunction may be terminated.